LEO WOLFSON, Appellee, v. ALLEN BROTHERS COMPANY, Appellant.

Sales: COMMISSION CONTRACT: REJECTION OF ORDERS.   A contract
1   providing that an agent shall receive a commission for the sale of goods on all orders taken by him which his principal may "accept and ship" is binding to the extent only of the accepted orders, in the absence of a showing of bad faith on the part of the principal in rejecting orders.

Commissions: BAD FAITH OF PRINCIPAL: EVIDENCE. In an action
2  by an agent for commissions for the sale of goods, where it is
    claimed that the principal was to accept and fill all orders
    from persons having a certain rating, but that he acted in bad
    faith in refusing to fill certain orders, it must appear, in
    order to bind the principal, that the credit rating of such re-
    jected customers was one known to and in use by the defend-
    ant, and private information obtained by the agent as to the
    responsibility of such customer is inadmissible for the purpose
    of establishing bad faith.

Financial Responsibility: EVIDENCE OF. For the purpose of
3  establishing the financial standing of parties it is incompetent
    for a witness to testify to their reputation, and in the absence
    of knowledge, except that gained from general reputation, a
    witness is incompetent on the question of the financial respon-
    sibility of another.

Sales; CAR LOAD LOTS: BURDEN OF PROOF. Where the contract
4  between the manufacturer and his agent provided that the
    agent should be paid commissions on his approved sales, but
    the sales must amount to car load lots; held, in an action by
    the agent for his commissions on orders not filled that the
    burden was on him to show such orders to the amount of a
    car load.

*Appeal from Pottawattamie District Court.*—Hon. O. D.
Wheeler, Judge.

MONDAY, MAY 18, 1903.

ACTION to recover commissions on goods alleged to
have been sold by plaintiff for the defendant company.
Trial to a jury. Verdict and judgment for plaintiff, and
defendant appeals.—*Reversed.*

*Mayne & Hazelton* and *Gaines, Kelby & Storey* for
appellant.

*G. H. Stillman* and *Stone & Tinley* for appellee.

DEEMER, J.—On May 24, 1899, the parties hereto en-
tered into the following contract:
"Articles of agreement entered into by and between
Leo Wolfson of Dallas, Texas, and Allen Bros. Co. of

Omaha, Nebraska, this 24th day of May, 1899, whereby said Allen Brothers Company hereby appoint said Leo Wolfson general agent for the sale of 'C. P. Baking Powder' in the State of Texas and Shreveport La. on the following terms: Leo Wolfson is to receive a straight commission of two and one-half (2.50) dollars on every barrel of C. P. Baking Powder which he or his employes may sell in the State of Texas and which orders Allen Bros. Co. may accept and ship, with the privilege of drawing same at any time any amount may be accruing to him, it being understood that this commission arrangement will apply not only to the original orders but upon duplicates and mail orders received and accepted during the term of this contract.

"A barrel of 'C. P.' Baking Powder is to contain at least fifteen (15) dozen cans assorted to suit purchaser it being preferable, however, that each barrel contain the regular assortment consisting of five (5) dozen ten (10) ounce cans, five (5) dozen fifteen (15) ounce cans and five (5) dozen twenty-five (25 ) ounce cans.

"The price at which 'C. P.' Baking Powder shall be sold in the State of Texas will be eighty (80c.) per dozen for the ten (10) ounce cans, one dollar and fifteen ($1.15) for the fifteen ounce cans and one dollar and eighty cents ($1.80) for the twenty-five ounce cans, delivering at Fort Worth, Dallas, Waco, Austin or Houston, provided a sufficient number of barrels have been sold in each of the above named cities and tributary territory to equal the capacity of a car, it being understood that the intention is to ship 'C. P.' Baking Powder to the principal cities of Texas in carloads for distribution from those points to the surrounding territory.

"Allen Bros. Co. agree to liberally advertise, through the mail and otherwise by their usual system, every barrel of Baking Powder sold through Leo Wolfson, and also to sample such cities as they may consider preferable to the

usual mail advertising, and at all times to the best of their ability give the most prompt and satisfactory service of which they are capable. Leo Wolfson agrees to accept the above proposition and to employe a sufficient force of traveling men at his own expense to thoroughly canvass the various parts of the state of Texas and prosecute the sale of 'C. P. ' Baking Powder in Texas.

"Allen Bros. Co. agree to pay the actual transfer expenses in connection with the distribution from each as it may be shipped on orders taken by Leo Wolfson or his representatives. And it is further agreed and understood that this arrangement may be terminated at any time that it may prove unprofitable to either party upon giving written notice of such termination."

Plaintiff says that he took two hundred and fifty-one orders of one barrel each for baking powder, of wh·ch defendants accepted and shipped one hundred and thirteen; that it refused and neglected to ship one hundred and thirty-eight orders from reputable and financially responsible merchants in the state of Texas. He further alleged that defendant agreed to accept and fill orders from all merchants who had a credit rating of $500 or more, and to pass upon orders from merchants having less than that rating as soon as possible; that, acting on this, plaintiff was at large expense in procuring the one hundred and thirty-eight orders, and that, after obtaining them, defendant arbitrarily, and without just cause or excuse, refused to accept the orders, although the parties from whom they were taken had the necessary credit rating. These last allegations are based on letters to the plaintiff under dates of July 4 and July 13, 1899, respectively, which we reproduce in order that the exact claims of the parties may be undertsood:

"Leo Wolfson, Esq., Dallas, Texas—Dear Sir: We regret that we cannot accept the order sold to Mr. J. Dreeborn from the fact that the quantity sold would not justify

an acceptance. We also regret to state that we are in receipt of a letter from B. Trippett this morning canceling the order he gave you on the 29th.

"Please impress upon the minds of all your representatives the importance of selling only to the better class of trade as there is certainly neither money or glory in taking orders from irresponsible parties. Where orders are sold to parties having any reasonable rating, credits are passed upon at once without further inquiry, but where the man is rated with a capital of less than $500.00 with no credit rating whatever, we are obliged to ask for special reports and this takes usually about ten days to receive the report.

                              "Yours truly,    Allen Bros. Co."

"Leo Wolfson, Esq., Dallas, Texas—Dear Sir: In regard to your favor of the 9th inst. suggesting that we furnish you with authority to make application to the Mercantile Agencies in order to expedite matters would say that all merchants having any rating of $500.00 or over receive the powder without any further investigation, and as no doubt a large portion of your orders will be taken from merchants who are better fixed than this, there would be many requests for special reports, all of which cost money and which will be necessary to be had. In view of this fact we do not think it would be advisable to do as, you suggest and on the small merchants who have no rating whatever, we assure you we will expedite matters as rapidly as circumstances will permit.

                              "Yours truly,    Allen Bros. Co."

Defendant denied on information and belief the genuineness of the signatures to the orders in controversy. It admitted the receipt of what purported to be one hundred and twenty-one of these orders, says that twelve or thirteen were countermanded by the parties who gave them, and that none of the others were accepted by them. It denies that it willfully, arbitrarily, and without cause,

refused to accept the orders, and says that they were rejected because the parties did not have sufficient credit rating.    The case was submitted to the jury on the theory that plaintiff should show that he forwarded to defendant genuine orders for at least a car load—one hundred barrels —of baking powder, which were received by it; that they were from reputable and financially responsible merchants, willing and able to pay for the goods; that defendant accepted these orders, or arbitrarily, wantonly, willfully, and without just cause, refused to accept and ship the same; and that of the orders accepted by defendants those from purchasers having a rating of $500 or over, and from purchasers not having such a rating which were rejected in bad faith, there must have been one hundred in order to entitle plaintiff to recover anything.

The contract provides that plaintiff is to have a commission on orders which "defendants may accept and ship." This is a valid agreement, and, in the absence of a showing of fraud or bad faith on defendant's part, plaintiff was not entitled to a commission on any orders taken by him which were not accepted and shipped.    *Walker v. Tirrell*, 101 Mass. 257 (3 Am. Rep. 352); *Sanderson v. Tinkham*, 83 Iowa, 446.

1. COMMISSION contract: rejected orders.

It is a time-honored maxim that no man shall take advantage of his own wrong; but in a case like the present, where a large discretion is vested in him who is to act, the evidence as to bad faith or wrong motive must be clear and satisfactory.    As bearing on this question, the letters from which we have quoted were unquestionably admissible, and plaintiff, in so far as this appeal is concerned, may properly insist that orders from all persons having a credit rating of $500 or more should be counted as accepted.

2. COMMISSIONS: bad faith of principal: evidence.

But this credit rating must have been one known to and in use by the defendant, and not some private rating or financial standing procured by and known only to

plaintiff. The parties evidently had in mind the well-known agencies, such as Dun's and Bradstreet's; indeed, the evidence leaves no doubt whatever on this subject. As to orders from parties having a less rating than $500, the defendant undoubtedly had a wide discretion about accepting them, and according to the letters on which plaintiff relies it was privileged to, and in fact undertook to, procure special reports, and on the strength of these reports to give credit or not, as it saw fit, so long as it acted in good faith. Of the orders in dispute ninety-two had a rating of less than $500. Ten of the one hundred and thirty-eight orders were canceled by the parties making them before acceptance by the defendant. So that at most but thirty-six orders met the requirement exacted by the defendant in its correspondence. To meet this situation, plaintiff and another witness were placed on the stand to show that the parties from whom the orders were taken had a commercial standing entitling them to credit for the amount of their orders. Much of this evidence was of no value whatever, as the witnesses did not know the parties, had never been in the towns where their business was carried on, and knew nothing of their financial worth or standing except as gathered from commercial travelers or from local trade journals. The parties had no rating in the reports of the well-recognized agencies, and defendant, in so far as shown, had no knowledge, or notice of their standing except as gathered from special reports received by them from the Dun and Bradstreet Agencies. In other words, defendant did not, so far as shown, have any knowledge of the information which plaintiff says he obtained as to the repsonsibility of the parties who made the orders. Surely, this private information obtained by him, and of which defendant had no notice, should not alone be considered as evidence of bad faith on the defendant's part. The evidence, if admissible at all, tended to prove that in some instances the parties may have been entitled

to credit for the amount of their orders, but this alone would not make out a case of bad faith on the part of defendant in rejecting them.

Moreover, much of the testimony given by these witnesses was incompetent, and the objections thereto should have been sustained. The witnesses were not asked as to their knowledge of the financial standing of the parties whose order were taken, but as to their reputation. This was improper. *Sheldon v. Root*, 16 Pick. 567 (28 Am. Dec. 266); *Hall v. Ballou*, 58 Iowa, 585; *Iselin v. Peck*, 2 Rob. 629. In *Lacy v. Kossuth Co.*, 106 Iowa, 23, after reviewing the authorities, we held that a witness who had made an investigation as to the of amount of property possessed by another might testify that such other had no property out of which a bill might be collected; but we expressly affirmed the rule that a witness who had no knowledge except that gained from general reputation or other hearsay sources could not testify as to the financial condition of another. Of course one who knows the facts may testify as to solvency or insolvency. *Hard v. Brown*, 18 Vt. 87. But such conclusion cannot be based on mere hearsay. *Martin v. Meyer*, 112 Ala. 620 (20 South. Rep. 963). We need not set out all the rulings which offended against these principles. A few sample questions will suffice to show the errors of the trial court: "Q. Taking into consideration the business transaction you had with Ralen & Son, the terms of sale, the amount of sale, I wish you would state whether or not, in your opinion, Ralen & Co. had commercial standing entitling them to a credit of $18.75." 'Q. Now, taking into consideration the sale to them—the consignments providing that they should have all sold within a period of four months and return all unsold, the value of the consignment being $18.75—considering the number of cans of baking powder, you may state whether these men at that particular time were entitled to consignment

*3 FINANCIAL responsibility; evidence of.*

upon credit." "Q.   Examine Schedule A [the list of names], and state whether or not the contracts or orders of the parties for merchandise, and payment of money in sums not exceeding $19.50 in any one instance, executed by parties or merchants whose names appear in Schedule A, possessed any value, and, if so, state fully what value they possessed during the months of June, July, and August, 1889." These questions were also erroneous in that they permitted the witnesses to usurp the functions of the jury; and the last one was clearly improper, and irrelevant to any of the issues in the case. It was not a question as to the value of the orders obtained by the plaintiff, but of defendant's good faith in refusing to accept them because they were from parties having a credit rating of less than $500.

II.   Under the instructions given by the trial court, plaintiff was not entitled to recover unless he showed in the aggregate one hundred orders, made up of orders accepted by defendant, orders from parties having a rating of $500 or over, and orders from parties having less than that rating, which were rejected by defendants in bad faith. This plaintiff failed to do. The burden was upon him, in view of the terms of the contract, to show bad faith of the defendant in refusing to accept orders, and this, we think, he failed to do. The evidence is undisputed that defendant in good faith attempted to find out the responsibility of those men who sent in orders whose rating was less than $500, and that it rejected many of them because the parties were not entitled to credit. Plaintiff argues that defendant refused to fill the orders because it was unable to supply the goods, but this is not sustained by the record. Our conclusions as to the law of the case do not exactly accord with those of the trial court, as will be observed from what we have heretofore stated, but conceding, for the purposes of this opinion, that the

4. SALES: car load lots: burden of proof.

charge correctly gave the law, still there was error in over-
ruling the motion for a new trial for two reasons: First,
because plaintiff did not establish the acceptance or rejec-
tion of at least one hundred orders, which should have
been accepted; and, second, because there was no sufficient
evidence of bad faith on the part of the defendant in
rejecting the orders. The contract was perfectly legal,
and there were doubtless good reasons for reserving to
defendant the right to accept the orders and to ship the
goods. Plaintiff might have required a stipulation that
defendant assign some good reason for not accepting the
orders and shipping the goods, but he did not see fit to do
so. Consequently he took the risk of satisfying defendant
as to the propriety of accepting the orders, and so long as
defendant acted in good faith plaintiff had no cause for
complaint. A large discretion was necessarily vested in
the defendant, for it was not only parting with its proper-
ty, but also obligating itself to pay a commission on goods
sold. In such a case the evidence as to bad faith should
be sufficient not only to overcome the presumption of good
motives and honest intent, but clearly show arbitrary and
willful misconduct on defendant's part. The case must
also be reversed because of errors in the admission of
testimony.—REVERSED.